

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                    :
**UNITED STATES OF AMERICA**,                                       :
                                                                    :
              – against –                                           :   **MEMORANDUM DECISION AND**
                                                                        **ORDER**
                                                                    :
                                                                        25-CR-266 (AMD)
**AARON RICHARD**,                                                  :
                                                                    :
                                                                    :
                          Defendant.                                :
                                                                    :
------------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

Before the Court is the defendant's motion to suppress physical evidence recovered

pursuant to a search warrant and his statements to law enforcement.  The Court held a hearing on

the motion on January 14 and January 30, 2026.  The motion is denied, as explained below.

## BACKGROUND[1]

### I.      The Arrest

At about 7:25 p.m. on August 12, 2025, New York City police officers responded to

gunshots in the Flatbush neighborhood of Brooklyn.  (ECF No. 32-2 ¶ 8; *see also* ECF No. 38-1

at 6:20–10:53; Transcript of January 14, 2026 and January 30, 2026 Motion Hearing ("H.")

47:14-16.)  The officers saw two men shooting at each other on the street.  (ECF No. 32-2 ¶ 8;

*see also* ECF No. 38-1 at 6:20–6:34.)  The officers shot and wounded one of the men.  (ECF No.

---

[1] The facts are drawn from the complaint and indictment, the hearing testimony, the parties' briefing, and
the following exhibits: the affidavit in support of the search warrant application (ECF No. 32-2), the
surveillance footage of the shootout in Flatbush (ECF No. 38-1), emails and documents reviewed by
Detective Koehler (GX 2, GX 3, GX 16), NYPD database results generated by Detective Koehler (GX
18), the Enforcement Action Briefing (GX 5), Google Maps and photos of 364 Pine Street (GX 4; GX
14), body-worn camera footage from 364 Pine Street (GX 9, GX 10, GX 12, GX 13), a sworn affidavit
by Ms. Jeangilles (ECF No. 32-1), video footage of the defendant's interview at the FBI office (ECF
No. 38-5), and the defendant's signed waiver of his constitutional rights (ECF No. 38-6).

38-1 at 6:26–6:42; ECF No. 32-2 ¶ 8; H. 44:19-25.)  The other man fled.  (ECF No. 38-1 at 6:28–6:32; ECF No. 32-2 ¶ 8.)  The shooting was captured on videotape, and investigators identified the defendant as a possible match to one of the shooters.  (ECF No. 32-2 ¶ 11; ECF No. 38 at 9.)  The defendant's parole officer confirmed that the defendant was one of the shooters on the videotape.  (ECF No. 32-2 ¶ 11; ECF No. 38 at 9; H. 8:3-8.)  The video shows the defendant and four other men talking on a busy sidewalk.  (ECF No. 38-1 at 4:43–6:15.)  At one point, the defendant punched one of the men.  (*Id.* at 6:10–6:20.)  Another man pulled out a gun and fired at the defendant, who fired back.  (*Id.* at 6:20–6:27.)  The defendant ran away when the police arrived.  (*Id.* at 6:27–6:31.)

The NYPD issued a probable cause I-card for the defendant.  (H. 6:18–7:13.)[2]  Around 9:00 a.m. on August 13, 2025, Sergeant Declan Ludington assigned the I-card to Detective Robert Koehler.  (H. 7:14-19.)[3]  Detective Koehler ran "[g]eneral computer checks" on the defendant, including for information about his last known address and whether he was on probation or parole.  (H. 8:9-15.)  Detective Koehler learned that the defendant had been released from prison in April 2025 and was on parole.  (H. 8:16-20, 9:20-23.)  Detective Koehler contacted the defendant's parole officer, who told him they did not have a verified address for the defendant, but that his next scheduled parole meeting was later that morning.  (H. 8:25–9:19.)  Detective Koehler went to a precinct near the parole office, but the defendant did not show up.  (H. 9:11-13, 36:12-18.)  According to the parole officer, the defendant had never been late for or missed a parole meeting.  (H. 25:13-17.)

---

[2] The NYPD issues probable cause I-cards for individuals who are "wanted for a particular crime."  (H. 6:18-19.)

[3] Sergeant Ludington and Detective Koehler are members of the U.S. Marshals Service Regional Fugitive Task Force (H. 5:12-23, 61:15-21), which helps the NYPD locate and arrest people wanted for crimes (H. 5:24–6:1, 7:20–8:2).

2

At that point, Detective Koehler asked Investigator David Fernandez from the Department of Corrections and Community Supervision ("DOCCS") for information about people who contacted the defendant or sent him packages or money while he was incarcerated. (H. 10:1-17.)  At 11:24 a.m., Investigator Fernandez sent Detective Koehler the names and addresses of four people whom the defendant contacted via JPay, two people who sent the defendant packages, and three people who sent him money, as well as three phone numbers he frequently called when he was incarcerated.  (GX 3.)[4]

Based on this information, Detective Koehler determined that the defendant had received calls from a phone number ending in 9661, and money from Woodlande Jeangilles, who used the same phone number.  (H. 15:8-17.)  Detective Koehler ran the 9661 phone number through an NYPD database and learned that someone had called 911 fourteen times from that number. (H. 16:12-19; GX 18.)  He also learned that the number was linked to a summons issued to Woodlande Jeangilles.  (H. 16:12-19, 19:8-19; GX 18.)  Some of the 911 calls — including one from July 15, 2025 — asked for a response to 364 Pine Street in Brooklyn, and some to the building across the street, 1049 Glenmore Street.  (H. 17:15-19, 18:2–19:3; GX 18.)  Detective Koehler determined that the 9661 phone number was associated with someone who lived at 364 Pine Street.  (H. 19:23–20:5.)  When he ran a search for 364 Pine Street through the NYPD database, he found that Ms. Jeangilles filed a domestic incident report in November 2023 and gave her address as 364 Pine Street, Apartment 2.  (H. 17:20–18:1, 23:2-23; GX 16.)[5]

At 5:13 p.m., a sergeant emailed Detective Koehler the defendant's EBT card transaction history for August 12 and 13, 2025, which showed that the defendant swiped his EBT card at the

---

[4] JPay is an app used to contact incarcerated people.  (H. 14:10-12.)

[5] The defendant was not the subject of that report. (H. 54:8-12; GX 16.)

3

deli located at 2740 Pitkin Avenue at 10:58 a.m. and 11:00 a.m. on August 13.  (H. 20:6–21:19; GX 2.) [6]  The deli was about a block away from 364 Pine Street.  (H. 22:2-17; GX 4.)  Based on the information he had, Detective Koehler concluded that the defendant was likely at 364 Pine Street, even though that address was not on the list Inspector Fernandez sent.  (H. 24:4-10, 141:12-13; GX 3.)

Detective Koehler and other members of the Regional Fugitive Task Force had planned to try to apprehend the defendant the next day, August 14, at 6:00 a.m. in Staten Island, where the defendant's "last known addresses were."  (H. 26:5-11.)  At some point before his shift ended on August 13, Detective Koehler emailed the team members an "Enforcement Action Briefing" or "USM-45," which included details about the defendant, the defendant's picture, and the location in Staten Island where they would try to apprehend him.  (H. 26:17–28:23; GX 5.)  When Detective Koehler determined that the defendant was probably at 364 Pine Street in Brooklyn, he told the team that the plan was to look for the defendant at that address.  (H. 25:20–26:11.) [7]

At around 6:00 a.m. on August 14, Detective Koehler met with the task force in a parking lot near 364 Pine Street so that he could "provide everyone with details of the apprehension attempt."  (H. 29:13-20.)  At around 6:30 a.m., the officers, all of whom had radios, went to 364

---

[6] This was after the defendant missed the meeting with his parole officer.  (H. 21:24–22:1.)

[7] Detective Koehler concluded that the defendant was probably at 364 Pine Street at about 8:00 or 9:00 p.m.  (H. 26:1-4.)  At that point, he had already sent his team members the USM-45 and could not edit it remotely to update the address.  (H. 27:10-21.)  Detective Koehler and his team used the USM-45, even though it reflected the initial plan to go to Staten Island.  (H. 27:22-25; GX 5.)

4

Pine Street. (GX 12 at 00:00-1:00; H. 63:7-10.)[8, 9] Detective Koehler was stationed on the side of the building, another officer was nearby, and Investigator Fernandez was in an alley behind the building. (H. 29:4-12, 31:5–32:25, 119:14-18, 122:15–123:25.) At about 6:38 a.m., between five and seven officers, including Sergeant Luddington, went into the building. (H. 63:15-16, 64:7-15; GX 12 at 00:00–2:00.) Sergeant Luddington's role was to "handle[] communications," and he was responsible for "relaying what was going on on [sic] the interior to the people on the exterior." (H. 63:1-14.)

At 6:39 a.m., one of the officers knocked on the door of Apartment 2 twice, but no one answered. (GX 12 at 2:00–2:20.) He knocked a few more times, and called, "Police, U.S. Marshals, open the door." (GX 12 at 2:20–2:35.) Sergeant Ludington radioed that there was movement in Apartment 2 and that someone "just turned off the lights." (GX 12 at 2:35–2:45; H. 127:20–128:8.) The officer kept knocking. (GX 12 at 2:45–2:54.) At 6:40 a.m. a woman inside the apartment yelled that she was "coming." (GX 12 at 2:54–3:00.) The officers backed up to give her room to open the door. (GX 12 at 2:53–3:02.)

At the same time, Investigator Fernandez, who was still in the alley, saw someone inside Apartment 2 "prying down the top portion of the window" that faced the alley. (H. 129:20–130:22.) He said over the radio, "Movement in the rear window." (H. 130:7-11; GX 9 at 1:00–

---

[8] 364 Pine Street is a two story, corner townhouse with two apartments. (GX 14; H. 65:17–67:8.) A fence surrounds the front and side yard, and a gate opens to stairs that go up to the front door. (GX 14 at 1.) The front door opens into an entryway with two doors. (GX 14 at 3.) The door on the left goes to the first apartment, and the door on the right goes to the second apartment, which has a set of stairs leading to the apartment. (GX 14 at 3–5; H. 66:20–67:12.) Multiple tenants, including Ms. Jeangilles, occupied rooms in the second apartment, and there was a communal kitchen area. (GX 14 at 6–8; H. 67:13–68:1, 105:22–106:1, 106:14–107:2.)

[9] The timestamps in GX 12 are four hours ahead of the actual time that the events occurred; for example, while the timestamp shows that the video starts at 10:37 a.m., the events took place at 6:37 a.m. (ECF No. 56 at 9 n.1; *see also* H. at 70:20–71:6.) This is also true for GX 13.

1:02.)  Immediately afterwards, another officer yelled, "Rear window is coming down."  (H. 131:13-23; GX 9 at 1:03–1:05; GX 12 at 3:02–3:04.)  When the defendant stuck his head out of the window, Investigator Fernandez drew his service weapon, and ordered the defendant to "show me your fucking hands."  (H. 131:24–133:16; GX 9 at 1:05–1:07.)  At that point, the defendant "straighten[ed] out his arms to show he wasn't armed and proceeded to go back into the apartment."  (H. 133:25–134:10.)  Another officer radioed that the "perp tried to escape through the window, he's coming back in, his hands are up."  (GX 9 at 1:07–1:10.)

In the meantime, when the officers inside the building heard "rear window coming down" over the radio, Sergeant Luddington told the officers to "go, go, go," while another officer yelled "breach, breach, breach."  (H. 79:4–80:13; GX 12 at 3:00–3:05.)  Before the officers could get into the apartment, Ms. Jeangilles opened the door.  (ECF No. 32-1 ¶ 6; GX 12 at 3:05–3:10; H. 81:9-15.)  The officers moved her out of the door frame and ran into the apartment and up the stairs, yelling at the defendant to get on the ground.  (ECF No. 32-1 ¶ 6; GX 12 at 3:10–3:20.)[10] When the officers reached the top of the stairs, the defendant was lying on the kitchen floor, in front of the window.  (GX 12 at 3:15–3:22; H. 90:4-22.)  The officers handcuffed him.  (H. 91:1-4.)  As they took him out of the building, one officer asked him if he tried to escape out of the window; the defendant said he was trying to "buy [himself] some time, so [he] could figure this stuff out."  (GX 10 at 3:14–3:24.)

Members of the task force did a "safety sweep;" they checked the rooms off the kitchen to "make sure everyone [was] okay and there [were] no additional threats."  (H. 91:5-10, 105:18–

---

[10] One of the officers had drawn his weapon.  (H. 102:4-5.)

107:2.)  They looked "anywhere where a person could be possibly," and checked under beds and in closets.  (H. 107:5-11.)[11]

## II.    The Custodial Interview

Law enforcement officers took the defendant to an FBI office in Manhattan, where one of them advised him of his constitutional rights.  (ECF No. 38 at 12; ECF No. 38-5 at 1:44:28–1:45:50.)  The defendant signed a waiver form in which he acknowledged that he had been advised of his constitutional rights and was "willing to answer questions without a lawyer present."  (ECF No. 38-6 at 2.)  The officers interviewed the defendant for about an hour and a half.  (ECF No. 38-5 at 1:45:50–2:47:41, 3:23:22–3:46:24.)  Among other things, the defendant admitted that he was in video of the shooting in Flatbush, but said that he shot "one time in the air" after the other man shot at him first.  (ECF No. 38-5 at 2:14:53–2:15:48.)

## III.    The Search Warrant and Subsequent Search

On August 14, 2026, the government applied to Magistrate Judge Seth Eichenholtz for a search warrant authorizing it to search the second floor of 364 Pine Street.  (ECF No. 32-2.)  In the supporting affidavit, FBI Special Agent Amanda Van Houten said that ███████████

████████████████████████████████████████████████████

████  (ECF No. 31-2 ¶ 15.)  Agent Van Houten also said that "[o]fficers conducting a protective sweep on [sic] the residence also saw a round of ammunition under a bed."  (ECF No. 32-2 ¶ 15.)  Judge Eichenholtz signed the warrant.  (*Id.* at 9.)  Officers searched the apartment and recovered a .380 Taurus pistol and 9mm Luger cartridge.  (ECF No. 32 at 10.)

---

[11] At least one of the rooms was locked.  (H. 107:17-19; *see also* GX 13 at 1:30–2:57.)

## IV.    Procedural History

The defendant was charged with possessing a firearm and ammunition, having previously been convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 11.)  On November 20, 2025, he moved to suppress all evidence recovered from the search of 364 Pine Street, including the gun and ammunition, as well as his post-arrest statements.  (ECF No. 32.)[12] The government opposed (ECF No. 38), and the defendant replied (ECF No. 42).  On January 14, 2026 and January 30, 2026, the Court held a hearing at which three witnesses testified.  (*ECF Minute Entry dated Jan. 14, 2026; ECF Minute Entry dated Jan. 30, 2026.*)[13]  The defendant and the government filed post-hearing briefs on February 20, 2026 and March 13, 2026, respectively. (ECF No. 50; ECF No. 56.)

### LEGAL STANDARD

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citation omitted).  And "the Fourth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."  *Payton v. New York*, 445

---

[12] The defendant also moved to sever his case from that of his co-defendant, Edynesson Bauduy.  (ECF No. 32 at 17.)  On January 30, 2026, the government stated that it no longer opposed the motion to sever, and the Court granted the motion.  (H. 159:12-13; *see also ECF Minute Entry dated Jan. 30, 2026.*)

[13] "In the Second Circuit, a defendant is entitled to an evidentiary hearing on a motion to suppress only if the defendant establishes a contested issue of material fact."  *United States v. Washington*, No. 12-CR-146, 2012 WL 5438909, at *8 (S.D.N.Y. Nov. 7, 2012) (citation modified).  The defendant's interview at the FBI office was recorded, and there were no contested facts about the interview.  Therefore, the hearing only addressed the motion to suppress the physical evidence.

U.S. 573, 576 (1980).  One of the exceptions to this rule is the existence of exigent

circumstances.  *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990) (*en banc*); *see*

*also Payton*, 445 U.S. at 590 ("In terms that apply equally to seizures of property and to seizures

of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent

exigent circumstances, that threshold may not reasonably be crossed without a warrant.").

Therefore, "police officers need either a warrant or probable cause plus exigent circumstances in

order to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).  In

determining whether there were exigent circumstances, the court must consider whether "a

reasonable, experienced officer [would] believe that there was an urgent need to render aid or

take action." *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (citation modified).

"On a motion to suppress, the defendant bears the initial burden of establishing that a

government official acting without a warrant subjected him to a search or seizure.  *United States*

*v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citation omitted).  "Once the defendant has

met this burden, the burden then shifts to the government to demonstrate by a preponderance of

the evidence that the search or seizure did not violate the Fourth Amendment." *Id.* (internal

citations omitted).  In the exigent circumstances context, "the police bear a heavy burden when

attempting to demonstrate an urgent need that might justify warrantless searches or arrests."

*Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984).

Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment

cannot be used in a criminal proceeding against the victim of the illegal search and

seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974).  The exclusionary rule applies

when the police "exhibit deliberate, reckless, or grossly negligent disregard for Fourth

Amendment rights." *United States v. Stokes*, 733 F.3d 438, 443 (2d Cir. 2013) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)).

## DISCUSSION

### I.      Physical Evidence

The defendant argues that "[t]he physical evidence that was recovered from 364 Pine Street, namely the .380 Taurus pistol and the 9mm Luger cartridge, must be suppressed as they were recovered pursuant to a tainted search warrant which relied on evidence obtained during the illegal entry of 364 Pine Street and arrest of Mr. Richard."  (ECF No. 32 at 13.)

### a.      Entry into 364 Pine Street

The defendant challenges both the entry into the building and into Ms. Jeangilles' apartment.  According to the defendant, the officers "illicitly entered the locked gate in the front yard and the door to the two-story duplex."  (ECF No. 32 at 13–14.)  The body camera footage shows that the gate was already open when officers opened the door to the apartment building.  (GX 12 at 00:00–00:20.)  Sergeant Luddington testified that he did not know whether the gate was locked when the officers arrived.  (H. 98:19-24.)  In any event, "it is the established law of this Circuit that the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors."  *United States v. Holland*, 755 F.2d 253, 255 (2d Cir. 1985).

Moreover, "a defendant has no legitimate expectation of privacy in 'a common area [that is] accessible to the other tenants in [a] multi-family apartment building.'"  *United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018) (quoting *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997)).  There is no "categorical rule regarding shared spaces in multi-unit buildings," and no precedent holding that "the Fourth Amendment *never* protects a tenant's rights in such shared spaces."  *United States v. Lewis*, 62 F.4th 733, 742 (2d Cir. 2023).  However, the defendant has

10

not "carr[ied] his burden to show that his Fourth Amendment rights extended to" the entryway and front yard of 364 Pine Street. *Id.* at 740. There is no evidence that either the gate or the front door was locked. Nor did the defendant "offer any evidence of the particular uses he made" of the front yard or the entryway, "argue that [they were] inaccessible to visitors," or "testify regarding any steps he took to maintain his privacy while using [them]." *Id.* at 741. Accordingly, the defendant has not established that he had a reasonable expectation of privacy in the front yard or entryway of 364 Pine Street.

### b.    Entry into Apartment 2

The defendant was Ms. Jeangilles's overnight guest, so he had a legitimate expectation of privacy in her apartment. *See Mosby v. Senkowski*, 470 F.3d 515, 519–20 (2d Cir. 2006) (citing *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)). According to the defendant, the officers violated *Payton v. New York* when they arrested him without a warrant inside Ms. Jeangilles' apartment. (ECF No. 32 at 14.) The government concedes that the officers did not have an arrest warrant, but argues that there were exigent circumstances — "namely, the defendant's attempted escape." (ECF No. 38 at 15.)

"Among the most common exigencies found to validate entry into a home with probable cause but without a warrant are the need to prevent the escape of a felon." *United States v. Delva*, 858 F.3d 135, 153 (2d Cir. 2017); *see also Olson*, 495 U.S. at 100 (noting that exigent circumstances justifying a warrantless entry include "the need to prevent a suspect's escape"). "The test to determine whether exigent circumstances exist 'is an objective one that turns on . . . the totality of the circumstances confronting law enforcement agents in the particular case.'" *Klump*, 536 F.3d at 117 (quoting *MacDonald*, 916 F.2d at 769). "The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer

to believe that there was an urgent need to render aid or take action." *Id.* at 117–18 (citation modified).

Courts in the Second Circuit use a "non-exhaustive, six-factor test, under which the court evaluates the 'circumstances in their totality.'" *United States v. Price*, No. 17-CR-301, 2017 WL 4838307, at *3 (E.D.N.Y. Oct. 23, 2017) (quoting *United States v. Gilliam*, No. 11-CR-1083, 2012 WL 4044632, at *2 (S.D.N.Y. Sept. 12, 2012)), *aff'd*, 845 F. App'x 85 (2d Cir. 2021). Those factors are:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*MacDonald*, 916 F. at 769–70 (citation modified). "A court may also examine if law enforcement had 'a reasonable belief . . . that the targets of an investigation are armed or that quick actions [sic] is necessary to prevent the destruction of evidence.'" *Carroll v. Krumpter*, 397 F. Supp. 3d 234, 245 (E.D.N.Y. 2019) (quoting *Abdella v. O'Toole*, 343 F. Supp. 2d 129, 139 (D. Conn. 2004)). These factors are "merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." *United States v. Medina*, 944 F.2d 60, 68 (2d Cir. 1991). They are "intended not as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account," and to serve "as guideposts intended to facilitate the district court's determination." *MacDonald*, 916 F.2d at 769–70. The presence of one factor alone may be sufficient to find that exigent circumstances justified a warrantless entry. *Id.* at 770.

12

The defendant concedes three of the factors: that the offense was serious, that the officers reasonably believed that the suspect was armed, and that there was a "clear showing" of probable cause. (ECF No. 42 at 4; ECF No. 50 at 10.)  He disputes the other factors, and argues that "the evidence adduced during the suppression hearing demonstrates that the government cannot establish an objectively compelling basis for law enforcement to bypass the warrant requirement and forcefully enter 364 Pine Street." (ECF No. 50 at 10.)

The defendant claims that the evidence on the fourth factor — whether the officers had "strong reason to believe" that the defendant was in Apartment 2 at 364 Pine Street — was "exceedingly thin." (*Id.*)  The government responds that the defendant "ignores . . . the evidence that the USMS task force developed connecting the defendant to 364 Pine Street, as well as the events that occurred while the task force was in the entryway at 364 Pine Street before entering the apartment," both of which "provided a strong reason to believe that the defendant would be located inside 364 Pine Street." (ECF No. 56 at 15–16.)

The hearing evidence established that the day after the shooting, Detective Koehler identified 364 Pine Street, Apartment 2 as an address associated with Ms. Jeangilles, who had called the defendant and sent him money when he was incarcerated. (H. 15:8–23:23; GX 3; GX 18; GX 16.)  In addition, the defendant swiped his EBT card at a deli a block away from 364 Pine Street around 11:00 a.m. on August 13, after he missed his parole meeting. (GX 2 at 2; H. 21:24–22:1.)  This provided "strong reason to believe" that the defendant was at 364 Pine Street, Apartment 2. *MacDonald*, 916 F.2d at 770.  And while the test for exigent circumstances is an objective one, the updated information about the defendant's location was of such importance that law enforcement shifted the arrest operation from Staten Island to 364 Pine Street. (H. 58:17-24.)

Moreover, immediately before the officers went into the apartment, Investigator Fernandez saw the defendant, whom he recognized from the enforcement briefing he reviewed in connection with the operation, put his head out of Apartment 2's window. (H. 132:25–133:8.) At that point, Investigator Fernandez radioed, "movement in the rear window," while another officer yelled "rear window is coming down" and said that the "perp tried to escape through the window." (GX 9 at 1:00–1:10.) This evidence demonstrates that the officers inside 364 Pine Street had a "strong reason" to believe that the defendant was in the apartment, and that there were exigent circumstances — an attempted escape. *See United States v. Mendoza*, 406 F. App'x 513, 516 (2d Cir. 2011) (summary order) (affirming the district court's finding that exigent circumstances existed in part because "[t]he agents knew [the defendant] had reentered his home because they saw him do so and observed him directly through the glass of the front door").

According to the defendant, however, he made "no serious attempt to flee," and "there was virtually no likelihood that he would have escaped had law enforcement refrained from rushing into 364 Pine Street." (ECF No. 50 at 12.) As for the seriousness of his efforts to escape, Investigator Fernandez saw him open the apartment window and stick his head out, which suggests that he was trying to get out. (H. 130:10–132:23.) He confirmed as much after his arrest, when he admitted to one of the officers that he was trying to "buy [himself] some time, so [he] could figure this stuff out." (GX 10 at 3:14–3:22.)[14]

Evaluating whether the defendant's chances of successfully escaping undermined the exigency facing the officers requires the Court to consider, with the benefit of hindsight, what

---

[14] The defendant made this statement before he was advised of his constitutional rights. However, "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980).

14

the officers inside the building should have done once they heard that the defendant — the suspect in a shooting who might be armed — was trying to escape from the back window. The alternative to going into the apartment would have been, in essence, to wait to see what happened, rather than going into the apartment to keep the defendant from escaping. Under these circumstances, waiting was not a reasonable alternative. The officers outside "saw [the] Defendant attempt to leave and then retreat back into the premises . . . both providing evidence of [the] Defendant's presence in the Residence and reason for concern that he might escape if not swiftly apprehended." *Price*, 2017 WL 4838307, at *4. Further, "no degree of coverage is infallible." *United States v. Paz*, 756 F. Supp. 744, 751 (S.D.N.Y. 1990); *see also United States v. Remy*, 658 F. Supp. 661, 667 (S.D.N.Y. 1987) ("Although the apartment was under surveillance, this is no guarantee that escape would be impossible."). Therefore, the fourth and fifth factors weigh in favor of finding exigent circumstances.

The sixth factor is "the peaceful circumstances of the entry." *MacDonald*, 916 F. at 770. The defendant argues that the officers' entry into 364 Pine Street was "forceful and violent." (ECF No. 50 at 13.) Before they got notification that the defendant was trying to escape, the officers knocked and announced themselves. (GX 12 at 2:00–2:54.) Ms. Jeangilles then opened the door. (*Id.* at 3:05–3:10.) When they learned of the defendant's attempt to escape, the officers moved Ms. Jeangilles out of the way, and ran up the stairs. (*Id.* at 3:02–3:10.) These circumstances are "enough to satisfy the 'peaceful entry' contemplated in [the sixth] factor, because '[t]he police, by identifying their mission, give the person an opportunity to surrender himself without a struggle and thus to avoid the invasion of privacy involved in entry into the home.'" *Genovese v. Scrheiner*, No. 19-CV-950, 2023 WL 6442834, at *9 (D. Conn. Oct. 2, 2023) (quoting *Dorman v. United States*, 435 F.2d 385, 393 (D.C. Cir. 1970)); *see also Medina*,

15

944 F.2d at 69 (holding that "by knocking and announcing that they were law enforcement officers, the agents acted according to the law and attempted a 'peaceful entry'" where they forced an apartment door open with a battering ram after knocking on the door and announcing themselves (quoting *MacDonald,* 916 F.2d at 771)).

The Court has carefully analyzed the *MacDonald* factors, and concludes that a reasonable, experienced officer confronted with the same circumstances that the officers did in this case would believe that there was an urgent need to take action.  *See Klump*, 536 F.3d at 117–18.  Accordingly, exigent circumstances justified their warrantless entry into the apartment.

The defendant argues separately that arresting him was "not a 'now or never' situation" because law enforcement "had ample time to obtain a warrant but chose not to do so."  (ECF No. 50 at 8 (quoting *Alexander v. City of Syracuse*, 132 F.4th 129, 147 (2d Cir. 2025)).)  According to the defendant, the officers had at least 20 hours — from 9:00 a.m. on August 13 when the I-card gave them probable cause, to about 6:00 a.m. on August 14 when they met about arresting the defendant — to get a warrant.  (*Id.*)  It is true that "[t]he exigent circumstances exception applies in situations presenting a compelling need for official action and *no time to secure a warrant.*"  *Alexander*, 132 F.4th at 149 (citation modified).  However, "[t]here are many entirely proper reasons why police may not want to seek a search warrant as soon as the bare minimum of evidence needed to establish probable cause is acquired."  *Kentucky v. King*, 563 U.S. 452, 466 (2011).  And the Supreme Court has "said that '[l]aw enforcement officers are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to establish probable cause'" and that "[f]aulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is

nowhere to be found in the Constitution." *Id.* at 467 (quoting *Hoffa v. United States*, 385 U.S. 293, 310 (1966)).

In *Alexander v. City of Syracuse*, the Second Circuit found that there were no exigent circumstances where "approximately three hours passed" between police officers' interview of the crime victim and the warrantless entry into the alleged perpetrator's house, and "no new information came to light to create an exigency during that time." 132 F.4th at 149. No evidence of the alleged exigent circumstance — destruction of evidence — "presented itself when [the officer] stood on the threshold of [the alleged perpetrator's] home and forced his way in," "[n]or did an exigency present itself at the moment before [the officer] pushed his way into the house." *Id.*

Whether there were exigent circumstances is measured "at the moment of the warrantless entry." *Harris v. O'Hare*, 770 F.3d 224, 236 (2d Cir. 2014), *as amended* (Nov. 24, 2014); *see also Genovese*, 2023 WL 6442834, at *10 (assessing exigent circumstances "in the moment that the officers breached the door"). In this case, "new information came to light" that "created an exigency" — the defendant tried to escape — and this exigency "presented itself" when officers were at the threshold of 364 Pine Street, Apartment 2. *Alexander*, 132 F.4th at 149. As explained above, a reasonable, experienced officer, confronted by these circumstances — a suspect in a recent shooting trying to escape out an apartment window — would believe that there was an urgent need to take action.

Accordingly, the defendant's motion to suppress is denied.

### c.    Protective Sweep

In his post-hearing brief, the defendant also challenges the protective sweep the officers did after they arrested the defendant. He argues that "there was no reason to believe anyone needed aid," "no reason to believe there were 'threats' to law enforcement," and "the alleged

17

exigency had been resolved before this warrantless search occurred." (ECF No. 50 at 13–14.) The Court addresses this claim, even though the defendant did not raise it in his motion. *See United States v. Acosta*, No. 12-CR-224, 2013 WL 1890337, at *6 n.6 (S.D.N.Y. May 6, 2013).

"When arresting a person in a residence, officers may perform a protective sweep incident to the arrest to protect themselves or others." *United States v. Lauter*, 57 F.3d 212, 216 (2d Cir. 1995).[15] "There are two types of protective sweeps." *United States v. Green*, No. 16-CR-281, 2018 WL 6413485, at *16 (S.D.N.Y. Dec. 6, 2018), *aff'd sub nom. United States v. Johnson*, No. 21-1896, 2024 WL 254118 (2d Cir. Jan. 24, 2024). First, "as an incident to the arrest," officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334. Second, "officers may conduct a broader sweep beyond the areas 'immediately adjoining' the place of arrest if there are 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual

---

[15] The Supreme Court approved of protective sweeps in *Maryland v. Buie*, 494 U.S. 325, 334 (1990). In that case, law enforcement officers were executing an arrest warrant inside a home. *See Buie*, 494 U.S. at 328; *see also United States v. Miller*, 430 F.3d 93, 97 (2d Cir. 2005) (describing the holding of *Buie* as "permit[ing] a limited warrantless search, or protective sweep, in a home by officers who were executing an arrest warrant inside the home and who had a reasonable suspicion that an individual posing a threat to the officers was present elsewhere on the premises"). The Second Circuit subsequently extended *Buie*'s holding to situations where law enforcement is present in a home "under lawful process, such as an order permitting or directing the officer to enter for the purpose of protecting a third party." *Miller*, 430 F.3d at 95. The Second Circuit has never explicitly extended it to situations in which the police entered a home pursuant to the exigent circumstances exception to the warrant requirement. *See Rivera v. Town of New Fairfield*, No. 22-CV-1874, 2025 WL 2613529, at *8 (S.D.N.Y. Sept. 10, 2025). Nonetheless, at least one district court in this Circuit has remarked that "a protective sweep may be reasonable, and therefore constitutional, where officers enter a suspect's home in order to execute a warrant, to enforce an order of protection, or pursuant to exigent circumstances." *United States v. Hassock*, 676 F. Supp. 2d 154, 161 (S.D.N.Y. 2009), *aff'd*, 631 F.3d 79 (2d Cir. 2011).

18

posing a danger to those on the arrest scene.'" *Green*, 2018 WL 6413485, at *16 (quoting *Buie*, 494 U.S. at 334).

"[T]he Second Circuit has ruled that a room counts as 'immediately adjoining' if it opens into 'a single, undivided space' that includes the place of arrest." *United States v. Salaman*, No. 20-CR-192, 2021 WL 5298075, at *5 (D. Conn. Nov. 15, 2021) (quoting *United States v. Kirk Tang Yuk*, 885 F.3d 57, 78–79 (2d Cir. 2018)).  Further, "[p]articularly when . . . an apartment is small, an immediately adjoining room is searchable under the 'protective sweep' exception." *United States v. Alejandro*, 100 F. App'x 846, 848 (2d Cir. 2004) (citing *Lauter*, 57 F.3d at 216–17).  "Such a search is lawful even absent reasonable suspicion to believe that third parties are present in the adjacent room or space." *Green*, 2018 WL 6413485, at *17.  Here, the officers conducted a protective sweep of rooms that opened onto the kitchen, which is where the defendant was arrested.  (H. 105:18–107:2.)[16]  The officers quickly checked each of these rooms, looking in closets and under beds.  (H. 107:5-11; GX 12 at 6:08–10:37; GX 13 at 00:00–3:22.)  This was a permissible "cursory visual inspection of those places in which a person might be hiding."  *Buie*, 494 U.S. at 327.  Because it fell within the first *Buie* category, the officers were permitted to search the areas immediately adjoining the kitchen where the defendant was arrested "without probable cause or reasonable suspicion."  *Id.* at 334.

---

[16] Neither the government nor the defendant introduced a floor plan of the apartment into evidence. Based on the body-worn camera footage, there were three bedrooms that opened onto the kitchen where the defendant was arrested.  (*See* GX 12 at 6:08–10:37.)  There appears to be a small hallway from the kitchen to another bedroom and bathroom.  (*See id.* at 6:08–7:03.)  Those rooms "immediately adjoined" the kitchen.  *See generally United States v. Clarke*, 133 F.3d 908 (2d Cir. 1997) (summary order) (concluding that a bedroom immediately adjoined the living room where the defendant was arrested, where the living room was located "immediately next to a short hallway which led to the bedroom"); *see also United States v. Sinclair*, No. 10-CR-6211, 2012 WL 5389729, at *6 (W.D.N.Y. Nov. 2, 2012) ("[W]hen officers execute an arrest warrant in a small apartment or premises, they generally will be entitled to perform a cursory sweep of the entire premises."), *report and recommendation adopted*, No. 10-CR-6211, 2013 WL 6154409 (W.D.N.Y. Nov. 22, 2013).

The defendant protests that the protective sweep "included members of law enforcement attempting to get into each room on the second floor, including several locked rooms, and in at least one instance breaking through a locked door." (ECF No. 50 at 7). However, "[i]n the course of a protective sweep, officers may damage personal property, including breaking the locks of closet, room, and apartment doors." *United States v. Lee*, No. 07-CR-3, 2010 WL 11489009, at *3 (S.D.N.Y. Jan. 12, 2010) (citation omitted), *aff'd*, 660 F. App'x 8 (2d Cir. 2016).

Finally, under *Buie*, a protective sweep must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335–36. The officers arrested the defendant at 6:41 a.m. (*see* GX 12 at 3:22), and completed the protective sweep approximately twelve minutes later (*see* GX 13 at 3:22). This satisfies *Buie*. *See Green*, 2018 WL 6413485, at *20 (concluding that a protective sweep was not "unreasonably long" where handguns were recovered within five to ten minutes after defendant was arrested).

The defendant argues that "[b]ecause the alleged exigency had been resolved before this warrantless search occurred, the ensuing search was unconstitutional." (ECF No. 50 at 13–14.) But the purpose of protective sweeps is to ameliorate the threat of an attack from third parties; "[t]he law permits a protective sweep of 'immediately adjoining' areas because an attack could feasibly be launched from such locations, presenting a safety risk to officers executing an arrest warrant." *Green*, 2018 WL 6413485, at *18. The defendant does not contest that the ammunition the officers saw during the protective sweep was in plain view. Accordingly, the search warrant was supported by probable cause. *See United States v. Constantinescu*, 147 F.4th 299, 313 (2d Cir. 2025) ("In sum, because the protective sweep of the garage was permissible

20

and the officers saw evidence of a crime in plain view during that protective sweep, there was probable cause for the issuance of the search warrant." (citing *Klump*, 536 F.3d at 118)).[17]

## II.    Statements to Law Enforcement

The defendant argues that the statements he made to law enforcement at the FBI office "were the product of his unlawful arrest and therefore should be suppressed as fruits of the poisonous tree." (ECF No. 32 at 16.)  As explained above, there were exigent circumstances justifying the warrantless arrest of the defendant inside the apartment.  Even if the arrest was unlawful, however, the defendant's statements at the FBI office are not subject to suppression. "[W]here the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*."  *New York v. Harris*, 495 U.S. 14, 21 (1990).  Therefore, even if the defendant's arrest violated *Payton*, the statements he made to law enforcement at the FBI office are not covered by the exclusionary rule as long as his arrest was supported by probable cause.  *See United States v. Whyte*, No. 21-CR-390, 2023 WL 8096926, at *5 (E.D.N.Y. Nov. 21, 2023).  The defendant "does not dispute that there was probable cause to arrest Mr. Richard for possession of a firearm – a serious offense that could

---

[17] Where a protective sweep is unlawful, "the evidence observed in plain view by agents during the sweep should not have been included in the subsequent search-warrant affidavit." *United States v. Kurniawan*, 627 F. App'x 24, 25 (2d Cir. 2015).  Therefore, a court evaluating a motion to suppress in cases where an unlawful protective sweep occurred must excise the evidence officers observed in plain view during the protective sweep from the affidavit and determine whether there was still probable cause to issue the search warrant. *Id.*  In this case, even if the protective sweep was unlawful and the evidence officers observed in plain view during the protective sweep had to be excised from the affidavit, there was still probable cause to issue the search warrant.

lead to a reasonable belief he was armed." (ECF No. 50 at 10.)  Accordingly, the defendant's motion to suppress his post-arrest statements to law enforcement at the FBI office is denied.[18, 19]

## CONCLUSION

For these reasons, the defendant's motion to suppress the physical evidence recovered from the search of 364 Pine Street, Second Floor, Brooklyn, New York, including the .380 Taurus pistol and ammunition, and the statements he made to law enforcement after his arrest is denied.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
    May 5, 2026

---

[18] The defendant argues that his statements at the FBI office "were not sufficiently attenuated from the unlawful arrest and should be suppressed." (ECF No. 32 at 16.)  However, under *Harris*, an attenuation analysis is not necessary.  *See Harris*, 495 U.S. at 19; *see also Senkowski*, 470 F.3d at 521.

[19] The defendant also argues that "all statements [he] made . . . while at 364 Pine Street" should be suppressed as "fruits of his unconstitutional arrest and the subsequent unlawful search of 364 Pine Street." (ECF No. 50 at 1.)  As explained above, the defendant's warrantless arrest did not violate the Fourth Amendment, so suppression of his statements at 364 Pine Street is not warranted on these grounds.  The government concedes that the defendant had not been advised of his constitutional rights when he made certain statements to law enforcement officers at 364 Pine Street. (ECF No. 38 at 16 n.4.)  The defendant did not address — and the Court does not decide — whether these statements should be suppressed under the Fifth Amendment.